AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>Andre Clark, | )<br>)<br>)<br>)<br>)<br>) |

Case No. 20-6318-Hunt

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 19-June 24, 2020 _____ in the county of _____ Broward _____ in the
_____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1343 and 2 | Wire Fraud |
| 18 U.S.C. §§ 1344 and 2 | Bank Fraud |
| 18 U.S.C. § 1349 | Conspiracy/Attempt to Commit Wire and Bank Fraud |

This criminal complaint is based on these facts:

**SEE ATTACHED AFFIDAVIT.**

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Michael Benivegna, Special Agent, IRS-CI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 8/3/2020

_____
*Judge's signature*

City and state: _____ Ft. Lauderdale, Florida _____

Hon. Patrick M. Hunt, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Michael Benivegna, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this Affidavit in support of a criminal complaint charging ANDRE CLARK ("CLARK" or "Defendant"), with wire fraud, bank fraud, attempt and conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, 1349, and 2, from on or about May 19, 2020, to at least on or about June 24 2020, in the Southern District of Florida, and elsewhere (the "Target Offenses").

2.      Defendant has participated in a scheme to obtain by fraud millions of dollars in forgivable loans through the Paycheck Protection Program ("PPP") and other government programs, conspiring with a person now cooperating with the investigation ("CHS 2") and others. Defendant obtained a fraudulent PPP loan for his own company, Top Choice LLC ("Top Choice"), with CHS 2 providing falsified documents and submitting the application on Defendant's behalf. Defendant also conspired to submit a number of additional fraudulent PPP loan applications for other companies by recruiting other confederate loan applicants, in order to receive kickbacks from those confederates.  To inflate the size of these PPP loans, and the corresponding kickbacks, the conspirators relied on a variety of false statements, including by submitting falsified bank statements and payroll tax forms.  For example, the conspirators used nearly identical versions of the same fabricated bank statements, recycled in the PPP applications for multiple companies with minor changes.

3.      The conspirators in the scheme planned or prepared at least 90 fraudulent applications, most of which were submitted.  Based on the evidence investigators have reviewed to date, CHS 2, Defendant, and their co-conspirators applied for PPP loans that are together worth

more than $24 million dollars, with at least approximately 42 of those loans approved and funded for a total of approximately $17.4 million. Certain of those loan recipients then wired a kickback of varying amounts, often approximately 25% of the fraudulent loan proceeds, to an account controlled by CHS 2.

4.      I am a Special Agent with the United States Department of The Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been employed in this capacity since October 2016. I am presently assigned to the Miami Field Office. My duties as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Code (Title 26 of the United States Code), the Bank Secrecy Act (Title 31 of the United States Code), and the Money Laundering Statutes (Title 18 of the United States Code). I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in April 2017 and the Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy in July 2017. In these two programs, I studied a variety of law enforcement tactics and criminal investigator techniques relating to tax and financial crimes. Since becoming an IRS-CI Special Agent, I have personally investigated and assisted in investigations relating to the Internal Revenue Laws and financial crimes. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners, including the Federal Bureau of Investigation and the Small Business Administration Office of Inspector General, to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 program.

5.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and from witnesses.

This Affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.[1]

## PROBABLE CAUSE

### *The Paycheck Protection Program*

6.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP.  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7.      In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

---

[1]      The conduct and charges described in this Affidavit are part of a larger investigation that is being conducted in this District and elsewhere.  As a result, not all numbered sources and anonymous individuals and entities are described in every filing.  I have included in this Affidavit only those individuals and entities I have deemed necessary to explain the particular facts set forth here.

8.    A PPP loan application must be processed by a participating lender.  If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the Small Business Administration ("SBA").  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

9.    PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

### *The Scheme to Obtain Fraudulent PPP Loans*

10.    On or about May 13, 2020, Phillip J. Augustin ("Augustin") and CHS 2 worked together to submit a fraudulent PPP loan application on behalf of a company owned by Augustin. Augustin submitted a PPP loan of $84,515 to a federally insured bank (hereinafter "Bank 3"), through a third-party company processor (hereinafter "Bank Processor 1").[2]  The application included bank statements that are clear forgeries, and CHS 2 has admitted that the application was based on documents that he falsified for Augustin.[3]

---

[2]    All banks referenced in this Affidavit are insured by the Federal Deposit Insurance Corporation.

[3]    On June 25, 2020, investigators arrested CHS 2 and another person now cooperating with the investigation ("CHS 3") and executed search warrants at their residences.  Following his arrest, CHS 2 chose to cooperate with the investigation in the hope of obtaining favorable consideration in connection with his pending charges.  CHS 2 was interviewed on that day, and has continued to cooperate with the investigation after obtaining counsel.  Most of his statements related herein have been corroborated by records obtained from third parties or recovered from his electronic devices.

11.     Following the success of that initial fraudulent PPP application, Augustin and CHS 2 began to work on obtaining more and larger PPP loans for Augustin's associates and others, generally for several hundred thousand dollars for each loan, up to as much as approximately $1.24 million.   Based on the evidence investigators have reviewed so far, CHS 2 and Augustin collectively coordinated applications for PPP loans that are together worth more than $24 million dollars.  The evidence also shows many more PPP loans were attempted but rejected by banks or their partners, or were planned and prepared, but not submitted before CHS 2's arrest.   The evidence suggests that all or nearly all of those loan applications were fraudulent, including Defendant's loan application and the applications Defendant orchestrated by referring additional confederates to the conspiracy.

12.     Investigators have obtained many other PPP loan applications that CHS 2 has admitted he submitted as part of this scheme, based on falsified documents, and have also obtained draft documents used or intended to be used in those applications or others.  These applications all follow the same pattern of fraud—many with obviously counterfeit February 2020 bank statements, and all with fabricated IRS Forms 941 (titled, "Employer's Quarterly Federal Tax Return") with the same indicia of fraud found in Augustin's initial application—but generally with even larger inflated payroll numbers, thus yielding much larger loans.[4]  CHS 2 has explained to investigators that the figures in the Forms 941 were the product of a formula that allowed him to start with a target loan amount, and then "back into" the payroll figures on the form.  He explained how he used figures that would produce an average monthly payroll for 2019 that, when multiplied by 2.5, would yield the requested loan amount.  In turn, the number of employees reported was

---

[4]     Some loan applications also included voided checks that appear to be falsified, such as a purported Bank 5 check that appears to have been produced on a computer and, as the subject line reads, "Converted to PDF," rather than a scan of an authentic check.

chosen based on fictional payroll figures, chosen to avoid an average employee salary that might raise suspicion.

13.     CHS 2 has also explained that he tried to use bank statements showing that the company had a large balance. Because so few companies had such a statement, and likely also because it was easier than keeping track of their true statements, CHS 2 repeatedly submitted near-replicas of the same falsified bank statements. In particular, CHS 2 appears to have recycled one statement each from Bank 1, Bank 6, and Bank 7. In recycling a statement, CHS 2 generally changed only the account number and the account holder's name and address, such that each version of the statement had identical figures and line items throughout the statement.

14.     A review of records for bank accounts controlled by CHS 2 at Bank 5 confirm CHS 2's admissions that he received numerous kickbacks, often of approximately 25% of the amount of the loans, and that he regularly wired Augustin a share of that kickback in the early stages of the scheme. CHS 2 explained that they were doing so many loans by the end of May that he changed course, instead wiring larger lump sums, collecting Augustin's shares of the kickbacks for multiple loans in one wire.

15.     Investigators are still receiving and analyzing records, but based on a preliminary analysis, as of July 24, 2020, investigators had identified a total of $2,367,765.82 in transfers to CHS 2's accounts from entities that each obtained a sizable PPP loan and that were identified in the PPP files seized from CHS 2's and another co-conspirator's residences, as described below—or from individuals associated with those entities.

16.     The PPP loans identified above as implicated in the foregoing kickback payments to CHS 2 represent only a fraction of the overall scheme. In executing search warrants at the respective residences of CHS 2 and CHS 3, federal agents found stacks of paper printed out and

organized by entity, containing an "intake form," fabricated Forms 941, or both for each entity. The intake forms contained fields for the information needed to fabricate the documents and fill out other aspects of the PPP application: identifying information about the owner and company, as well as bank account information for receiving the loan. A section at the end marked "BELOW IS OFFICE USE ONLY" included blank fields for the "Number of Employees," "Monthly Payroll Expense," and "SBA Loan Pre-Approval Amount." Between CHS 2's and CHS 3's residences, investigators seized paper files for PPP loan applications for approximately 80 different entities.

17.     Data obtained from the SBA showed additional PPP loan applications from additional entities that text message and email records show had been referred to CHS 2 by Defendant or other individuals.

### *The Fraudulent PPP Loan to Defendant's Company: Top Choice*

18.     According to Florida's Division of Corporations website ("Sunbiz"), Top Choice LLC ("Top Choice") was incorporated in or around June 2018. CLARK is listed as the company's president and registered agent. The address listed on Sunbiz for Top Choice, 4839 SW Volunteer Road Suite 226, Davie, Florida, is the same address listed for CLARK with Florida's Department of Motor Vehicles. Investigators visited this address and were unable to find any business named "Top Choice" at that location. Rather, that address appears to be merely a mailbox located in a "US Pak-N-Ship."

19.     According to Sunbiz, Top Choice was administratively dissolved in or around September 2019 for failure to file an annual report. It was then reinstated on or about March 29, 2020, two days after the passage of the CARES Act.

20.     According to bank records, on or about May 19, 2020, CLARK visited a bank in Miramar, Florida, and opened business checking and savings accounts in the name of Top Choice.

In opening the accounts, CLARK presented a North Carolina driver license and, to prove Florida residence, provided a Florida Power & Light power bill in the name of "Top Choice" and at the same address listed for the company on Sunbiz. The power bill states that the "rate" is for "RS-1 Residential Service."

21.     CLARK indicated to the bank that Top Choice had six employees and a gross annual revenue of $200,000. However, the bank records from these accounts reveal a total of $600 in deposits (and no withdrawals) for the month of May 2020.[5]

22.     The day after CLARK opened the Top Choice bank accounts, a PPP loan application package on behalf of Top Choice was electronically submitted to Bank 3 through Bank Processor 1. The loan application package included, among other documents: (1) purported Forms 941 for all four quarters of 2019 in the name of Top Choice; (2) a company bank statement for Top Choice; (3) an application form; and (4) a promissory note.

23.     The purported Forms 941 included in the application show quarterly payroll of more than $500,000 each quarter, for 25 employees. That quarterly payroll figure yielded the PPP loan application's "Average Monthly Payroll" figure of $195,426, which determined the $488,565 amount of the loan. Each was signed by hand with the name "Andre Clark" as the company owner, and also listed CLARK as the company's designee and as a "Paid Preparer," though he is not a paid tax preparer. The Top Choice Forms 941 follow the same style and pattern as the many other Forms 941 that CHS 2, described above, acknowledged that he helped create and submit in the course of the scheme, including in the indicia of fraud.[6] IRS records show that Top Choice did

---

[5]     The only activity in June 2020 consisted of the deposit of the PPP loan proceeds. The accounts were frozen on or about May 26, 2020.

[6]     As noted above, CLARK was listed as both owner and paid preparer. Dozens of other Forms 941 submitted in this scheme evidence the same error. CHS 2 has admitted that these

not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Florida Department of Revenue records show that Top Choice did not report any wages or employees for that same period.

24.     The purported company bank statement, which was submitted in electronic format is a clear forgery.  First, the statement purports to be for the month of February 2020, prior to the date that account was opened.  Second, according to the document's file "properties," the statement was created using "PDFFILLER," a program used to edit electronic PDF files, and was "modified using iText."

25.     The application form, labeled at the top "Payment Protection Program Borrower Application Form," listed CLARK as the owner of Top Choice, claimed the company had 25 employees, and stated that the average monthly payroll was $195,426.  Based on this figure, the amount of the PPP loan request was $488,565.  The application form required the borrower to electronically initial a number of "certifications," including: (1) that the applicant was in operation on February 15, 2020 and had employees to whom it paid salaries/payroll taxes or paid independent contractors, as reported on Form(s) 1099; (2) that the funds would be used to retain workers, maintain payroll, or make mortgage/interest/lease/utility payments as specified by the PPP rule

_____

documents share that feature because he misunderstood the form, and he (or someone following his instructions) prepared all of the Forms 941 at issue.  The content of the forms also indicate falsification.  All four quarterly forms are nearly identical, and the four forms for Top Choice are identical, down to the penny, in reported figures.  They also evidence a pattern of payroll spending that is likely false: each of the quarters shows significant increases from the first to second to third month of the quarter.  For each identical form, the same figures are reported for the tax liability incurred in the first month of each quarter, the same figure for the second month of each quarter (increased substantially from the first month), and the same figure for the third month of the quarter (increased substantially from the second month).  The result is that the company reports a perfectly repeating cycle of ascending payroll costs within each quarter.  CHS 2 has explained that this was due to a formula he used, allocating different percentages of the quarterly payroll tax liability to each month of each quarter.

and that unauthorized use could result in charges for fraud; and (3) that the information provided in the application, including in supporting documents, was "true and accurate in all material respects," and that making false statements could result in criminal charges. The application was electronically signed with the name "Andre Clark," and each certification was electronically initialed "AC."

26.     The promissory note, labeled at the top "Paycheck Protection Program Loan," set forth the amount of the loan ($488,565) and its terms (including that the proceeds could only be used for business purposes). The terms also specified that the borrower may apply for loan forgiveness only in an amount equal to the sum of certain specified costs: payroll costs, interest on mortgage obligations, rent obligations, and utility payments. The promissory note further specified that not more than 25% of the amount of forgiveness can be attributable to non-payroll costs. Additionally, the promissory note contained a "Representations and Warranties" section for the borrower to acknowledge, among other things that "the information provided in all supporting documents and forms to obtain this loan" were true and accurate. The promissory note was electronically signed with the name "Andrew Clark."

27.     Based on the representations made in the loan application paperwork and supporting documents, the PPP loan application for Top Choice was approved, and on or about June 1, 2020, Bank 3 wired approximately $488,565 in loan proceeds into the Top Choice bank account.

**_CHS 2 Confirmed to Law Enforcement that the Top Choice PPP Loan Was Fraudulent and that CLARK Referred Others to the Scheme_**

28. Investigators spoke with CHS 2 about CLARK and the Top Choice PPP loan. CHS 2 stated that he had met CLARK through Augustin. According to CHS 2, the three of them met on a number of occasions (sometimes at a gas station in Broward County) and discussed CLARK's PPP loan, as well as CLARK's referrals, for which CLARK would receive a small cut. As stated above, CHS 2 and Augustin had already agreed to share the 25% kickback payments that CHS 2 would usually receive from referrals, including from CLARK's referrals.

29. As to the Top Choice PPP loan, CHS 2 confirmed that the loan application was fraudulent and stated that he had assisted CLARK in preparing and submitting it. Specifically, CHS 2 stated that he discussed the details of the loan with CLARK, including the amount of the loan and the number of employees claimed on the application. CHS 2 also explained to CLARK that he would need a bank account and need to hire employees in order to make the loan look legitimate.

30. Additionally CHS 2 stated that he: (1) created for CLARK an online account for Top Choice with Bank Processor 1; (2) created and submitted the fake Top Choice bank statement; and (3) created, submitted, and signed (on behalf of CLARK), the false Forms 941. According to CHS 2, he did not recall signing the application form or promissory note, but he was uncertain on this point. Bank Processor 1's IP records for the Top Choice loan application show that a computer with an IP address (ending in 170) associated with CHS 2's residence in Broward County, Florida, logged into the Top Choice loan account as early as May 19, 2020.

31. CHS 2 also stated that, in addition to the Top Choice loan, CLARK referred to him a number of friends/associates for the purpose of creating and submitting additional fraudulent PPP loans. As stated above, CHS 2 and Augustin would share the kickback payments for these

referrals.  CHS 2 stated that he did not know how CLARK got paid for his referrals but that Augustin told him that CLARK was getting a cut.

***Emails and Text Messages Confirm CLARK's Knowing Participation in the Fraud***

32.     As part of its investigation, law enforcement obtained communications between CHS 2 and CLARK, including text messages and emails.  I have reviewed a number of these communications, which discuss, among other things, CLARK's PPP loan and the loans for the individuals and companies he referred to CHS 2.

33.     For example, on or about May 19, 2020, CHS 2 sent CLARK a text message that stated: "Hi Andre this is [CHS 2] lock in my number I am working on your file I need social security number and date of birth."  CLARK responded with his date of birth and social security number.  That same day, CLARK texted CHS 2 his email address, and CHS 2 responded: "Check your email and activate your account Just open email and click the link."

34.     On or about May 20, 2020, CLARK forwarded CHS 2 an email he had received from Bank Processor 1 with the subject, "You have an offer for the Paycheck Protection Program." The email stated: "Andre, the SBA has finished reviewing your application and you've been approved for your Paycheck Protection Program loan.  Accept your offer to access more information, including the next steps." The email included a link button to click, labeled "Accept."

35.     On or about May 20, 2020, CLARK separately texted CHS 2 with information that appears to relate to a different fraudulent loan application.  In the text message, CLARK provided: (1) a social security number; (2) date of birth; (3) email address; (4) business start date; and (5) state of incorporation.  (CHS 2 explained that CLARK was serving as a referral source, or middleman, between CHS 2 and the applicant, in exchange for a small fee).  After getting the information from CLARK, CHS 2 responded that he needed a check from the business.  CLARK

asked by text message: "Should he go to the bank in the morning and get temporary checks while he order some[?]," to which CHS 2 responded "[y]es we need check."

    36.     On or about May 27, 2020, CLARK sent a text message to CHS 2 with information regarding another, different referral. This information provided by CLARK included, among other things: (1) the individual's name, address, date of birth, social security number, and e-mail address; (2) the individual's business name, business address, EIN, and business start date; and (3) bank account and routing numbers. On or about May 28, 2020, regarding this same referral, CHS 2 texted CLARK that he needed "a february statement from her credit union make sure if she cant download and send in pdf she takes a good picture of it so i can modify it."

    37.     On or about May 30, 2020, CLARK texted CHS 2: "How many I gave you so far that is working besides the first two ones already completed […] I want at least 10 more people within the next few days."

    38.     During my review of CLARK's communications with CHS 2, I found what appears to be information pertaining to at least 14 different individuals and at least 15 associated corporate entities. Further investigation, including review of data collected by the SBA and bank records, to date has identified PPP loans totaling more than $3.5 million corresponding to these names and entities.

### *CLARK's Banking Activity Confirms His Knowing Participation in the Fraud*

    39.     I have also reviewed Top Choice's and CHS 2's bank records, which confirm CLARK's receipt of the PPP loan proceeds. Specifically, on or about June 1, 2020, Bank 3 wired the loan amount, $488,565, into the Top Choice account. As discussed above, however, Top Choice's accounts were frozen on or about May 26, 2020, so CLARK could not access the PPP loan funds.

40.     According to an investigator at Top Choice's bank, CLARK called the bank numerous times and then visited the bank's Miramar branch location in order to get his accounts unfrozen. During a phone conversation with CLARK, the bank investigator asked CLARK about the FPL power bill he had submitted when opening his account, which the investigator believed was a forgery. CLARK denied ever submitting the power bill. When the investigator asked CLARK about his PPP application, CLARK stated he would need to speak to his accountant. When asked for the name of his accountant, CLARK would not provide a name. Finally, when the investigator told CLARK that his PPP loan was suspected as fraudulent, CLARK simply stated "thank you" and hung up.

### CONCLUSION

41.     Based on the forgoing, I respectfully submit that there is probable cause to believe that ANDRE CLARK committed the Target Offenses.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
MICHAEL BENIVEGNA
Special Agent
IRS-CI

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this __39__ Day of August, 2020

_____
HON. PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE